IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION


JOEL OLIN KNIGHT,                              )
                                               )
                      Plaintiff,               )
                                               )
v.                                             )        No. 3:10-CV-174
                                               )
MICHAEL J. ASTRUE,                             )
Commissioner of Social Security,               )
                                               )
                      Defendant.               )

## <u>MEMORANDUM OPINION</u>

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of

defendant Commissioner's final decision denying plaintiff's claims for disability insurance

and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social

Security Act. For the reasons provided herein, defendant's motion for summary judgment

[doc. 15] will be granted, and plaintiff's motion for summary judgment [doc. 11] will be

denied.


I.


### *Procedural History*


Plaintiff was born in 1958. The parties agree that he suffered one or more

strokes in early 2007. Plaintiff applied for benefits in March of that year, claiming to be

disabled by communication problems. [Tr. 118, 121, 131]. He alleged a disability onset date

of March 8, 2007. [Tr. 118, 121]. The applications were denied initially and on

reconsideration. Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("ALJ") in May 2009.

In September 2009, the ALJ issued a decision denying benefits. She concluded that plaintiff suffers from "status post cerebrovascular accident with mild residuals, peripheral vascular disease, and degenerative disc disease," which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 18-19]. The ALJ found plaintiff to have a residual functional capacity ("RFC") for all levels of exertion, restricted by

> [no more than] frequent handling and fingering. The claimant has some limitations in talking but is functional for interaction with peers and supervisors in a work setting. He has some limitations in hearing but is functional for one-to-one interaction in a quiet environment. The claimant is able to understand and remember simple and low level detailed tasks, sustain concentration and persistence for such tasks despite periods of increased signs and symptoms, and set limited goals and adapt to infrequent change. He would experience some, but not substantial[,] difficulty [] in interacting with the general public and supervisors, and could relate to co-workers.

[Tr. 20]. Relying on vocational expert ("VE") testimony, the ALJ determined that plaintiff remains able to perform a significant number of jobs existing in the national economy. [Tr. 24-25]. Plaintiff was accordingly deemed ineligible for benefits.

Plaintiff then sought, but was denied, review from the Commissioner's Appeals Council. [Tr. 1, 6]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

## II.

### *Relevant Background*

### A. <u>Medical</u>

Plaintiff appeared at the Baptist Hospital emergency room on February 27, 2007, with complaints of numbness, pain, and incoherence. [Tr. 304]. On March 11, 2007, he was admitted to St. Mary's Medical Center with "the chief complaint of difficulty with speech and thinking" during the prior two days, along with a "significant decrease in dexterity in the right hand." [Tr. 310]. After examination and review of a CT scan of the head, attending physician Aaron Rittgers concluded that plaintiff had suffered a stroke. [Tr. 310-11]. Plaintiff was discharged four days later, with Dr. David Jerden stating that he "has made good progress with physical therapy and was deemed inappropriate for in-patient rehab." [Tr. 308].

Plaintiff first visited Dr. Savita Mistry on April 27, 2007. Plaintiff reported right side numbness, difficulty with speech, and inability to write. [Tr. 416]. Dr. Mistry noted decreased sensitivity in the legs, along with speech difficulty. [Tr. 417].

On May 26, 2007, plaintiff appeared at St. Mary's emergency room with complaints of increased right side weakness and trouble with articulation. [Tr. 349]. Dr. Steven Prince noted a limp and "hesitant speech." [Tr. 349-50]. Neurologic examination of the right arm showed "normal functioning." [Tr. 350]. The right leg appeared somewhat weaker than the left. [Tr. 350]. Dr. Dragos Hunteanu opined that plaintiff had suffered a

new mini-stroke. [Tr. 342].

Plaintiff returned to Dr. Mistry on June 20, 2007. He reported, and Dr. Mistry observed, improvement in speech. [Tr. 421]. Plaintiff purportedly remained unable to write. [Tr. 421].

Dr. Jeffrey Summers performed a consultative examination in July 2007. Plaintiff was "alert and oriented to person, place, time and situation. Cognitive function and intelligence [were] appropriate for his degree of formal education." [Tr. 362]. Plaintiff exhibited "a moderate degree of word finding difficulty. He [was] able to speak in somewhat broken sentences." [Tr. 362]. Strength was full in all major muscle groups, although plaintiff walked in a shuffling manner and showed "mild balance difficulties." [Tr. 362-63]. Dr. Summers concluded,

> it is reasonable to expect that he will have difficulty performing complex tasks and communicating in the workplace. He will also have difficulty balancing, climbing, working from heights, etc[.] as well as grasping, fingering, feeling, and manipulating objects on a frequent basis. His condition should be re-evaluated in 12-18 months for improvement.

[Tr. 363].

Psychologist Martha Wike performed a consultative mental examination in September 2007. Dr. Wike deemed plaintiff cooperative and credible. [Tr. 365, 370]. She described him as speaking "in a clear, coherent, and understandable manner, although he did have word finding problems and had difficulty expressing himself." [Tr. 367]. Abstract thinking appeared "very poor," and concentration appeared "fair to poor." [Tr. 367].

Intellectual functioning was rated in "the extremely low range," and testing further indicated "significant problems with memory." [Tr. 367, 369-70]. Dr. Wike also observed that "right side motor difficulty" rendered plaintiff "really unable to complete paper and pencil tasks." [Tr. 369]. She opined that plaintiff would be seriously impaired in his ability to understand and remember instructions, and that he would be moderately impaired in sustaining attention and concentration. [Tr. 371].

Plaintiff returned to Dr. Mistry on October 1, 2007. Physical therapy had generated some improvement in speech and walking. [Tr. 422]. Plaintiff continued to report some numbness in the lower legs, and Dr. Mistry speculated that a B-12 deficiency could be the cause. [Tr. 422].

In December 2007, nonexamining Dr. Brad Williams completed a Mental RFC Assessment form. Dr. Williams opined that plaintiff would be markedly limited in the activity of carrying out detailed instructions, and that he could not work with the public except in simple situations. [Tr. 399-401]. Dr. Williams is a psychiatrist. *See* Tenn. Dep't of Health License Verification, http://health.state.tn.us/licensure/Practitioner.aspx?ProfessionCode=1606&LicenseNumber=3625&FileNumber=14843 (last visited Apr. 29, 2011).

Also in December 2007, nonexamining Dr. Lloyd Walwyn completed a Physical RFC Assessment form. Dr. Walwyn predicted that plaintiff could work at the light level of exertion with restrictions in postural activities, exposure to hazards, and normal

speech. [Tr. 404-07]. In Dr. Walwyn's opinion, plaintiff could finger and handle on no more than a frequent basis. [Tr. 406].

Plaintiff returned to Dr. Mistry on December 20, 2007. Plaintiff reported confusion and limited focus, but Dr. Mistry "could communicate with him very well." [Tr. 424]. At a January 2008 appointment, Dr. Mistry noted "significant improvement." [Tr. 426]. Sensitivity was grossly intact, and plaintiff could walk without instability. [Tr. 426]. Plaintiff reported that he still could not walk long distances and that he experiences weakness and fatigue in his right hand when he writes. [Tr. 426].

Dr. Mistry referred plaintiff for neurological evaluation. On February 4, 2008, neurologist Scott Bridges reported normal bulk, strength, and tone. Sensory examination was intact. [Tr. 513].

Nonexamining Dr. Thomas Neilson completed a Mental RFC Assessment in May 2008, predicting no limitation of more than a moderate degree. [Tr. 446-48]. Dr. Neilson is a clinical psychologist. *See* Tenn. Dep't of Health License Verification, http://health.state.tn.us/licensure/Practitioner.aspx?ProfessionCode=1410&LicenseNumber=1256&FileNumber=1256 (last visited Apr. 29, 2011).

Upon referral from Dr. Mistry, plaintiff twice visited with counselors at Cherokee Health Systems ("CHS") in December 2007 and January 2008. Feelings of frustration and isolation were noted. [Tr. 557-58]. A CHS "Treatment Plan Review" form was completed in April 2008 and again in September 2008. [Tr. 533, 547]. The preparer of

these forms is unknown, but one form was "authenticated" by "Andrea Bischoff, BA" and the other by "Suzanne Bailey, PsyD." Each of these file review forms indicated the need to "rule out" a cognitive disorder. Each form assigned a Global Assessment of Functioning ("GAF") score of 50. [Tr. 533, 547].

Plaintiff underwent a speech and language evaluation in June 2008. Plaintiff was described as ambulatory and showing no signs of right-side weakness, but he nonetheless reported "a loss of feeling in his entire lower extremity." [Tr. 451]. Speech, articulation, and voice all appeared to be within normal limits. [Tr. 452]. Plaintiff "did not present with speech and language impairment typical of [a stroke] during his interview and language sample." [Tr. 452]. However, testing under the Oral and Written Language Scales ("OWLS") generated scores only in the fifth or sixth percentile. [Tr. 452].

On July 1, 2008, nonexamining source Patricia Allen completed a Physical RFC Assessment. Interpreting the speech and language evaluation, Ms. Allen wrote,

> The OWLS . . . was utilized, and claimant's performance indicated a mild difficulty with both receptive and expressive language skills. . . . Panelist indicated that claimant exhibits functional communication skills for basic social interactions, comprehending simple instructions and understanding concrete instructions but exhibits challenges in expressing higher level complex ideas. Speech was 100% intelligible in all contexts.
>
> Claimant will need to work in a structured environment where instructions are presented both visually and verbally and in a simple format. He is likely to need multiple repetitions to learn new tasks and would profit from learning through hands on instruction. Because of a decline in verbal fluency, claimant is likely to be more comfortable in an environment that does not require verbal interaction with the public. His language skills are functional for interaction with peers and supervisors. Claimant's ADL indicating that everything is

> 'different since the stroke' is partially credible but his allegation that he cannot
> talk, think of words, follow instructions or remember is negated by his
> performance at the Speech CE.

[Tr. 471, 474]. Ms. Allen is a licensed speech pathologist. *See* Tenn. Dep't of Health License Verification, http://health.state.tn.us/licensure/Practitioner.aspx?ProfessionCode=2023&LicenseNumber=506&FileNumber=506 (last visited Apr. 29, 2011).

Plaintiff returned to Dr. Mistry in November 2008 again complaining of numbness in the legs. [Tr. 545]. Dr. Mistry again thought there could be a B-12 deficiency, but he also speculated that the complaints could be stroke- or vascular-related. [Tr. 545]. In January 2009, Dr. Mistry referred plaintiff for neurological and vascular evaluation. [Tr. 539]. A February 2009 bilateral ultrasound of the legs showed impaired blood flow, mild on the left and moderately severe on the right. [Tr. 536].

Plaintiff reported back pain in March 2009. [Tr. 498]. The following month, he reported numbness from his chest down to his feet. [Tr. 490]. Plaintiff returned to the neurologist. Dr. Bridges told him "that the symptoms he is describing usually are not [a] sign of a stroke. They are usually more synonymous with structural problems of his spine." [Tr. 519]. Subsequent MRIs of the thoracic, cervical, and lumbar spines revealed only mild findings. [Tr. 491, 494, 499]. Dr. Bridges deemed the MRI results "normal." [Tr. 525]. Plaintiff then stated that his "biggest complaint" is leg fatigue after walking great distances. [Tr. 525]. Dr. Bridges speculated that the cause could be vascular insufficiency. [Tr. 525].

In April 2009, Dr. Donald Akers diagnosed "significant peripheral vascular disease," primarily in the right leg. [Tr. 579]. That diagnosis was confirmed by an arteriographic evaluation. [Tr. 581-82].

## B. Personal

At the administrative hearing, plaintiff testified that he is disabled because: "I can't walk. I mean, it's hard for me to walk" since his stroke; "I can't use my right hand"; and, "I get confused and, and if anybody ask[s] me a question, I have trouble understanding what they mean because of my stroke." [Tr. 31-32]. He testified that walking causes leg pain, but that his medication reduces that pain to a level of two on a scale of one to ten. [Tr. 33-34]. Plaintiff also stated that bathing causes difficulty because "I can't use my, I can barely use my right arm and it's hard for me to stand." [Tr. 37]. Plaintiff testified that he does not do laundry because he "can't fold anything." [Tr. 38]. He claims that, since suffering a stroke, he has done essentially nothing but watch television. [Tr. 142].

However, in July 2007, plaintiff told Dr. Summers that he is able to perform all activities of daily living without assistance. [Tr. 361]. In September 2007, he told Dr. Wike that he cares for his mother (who allegedly suffers from Alzheimer's Disease) during the day. [Tr. 366]. He also told Dr. Wike that he "is able to do most of the chores around the house *including laundry* . . . ." [Tr. 368] (emphasis added).

The ALJ questioned plaintiff at length regarding his prior substance abuse. [Tr. 36]. Plaintiff claimed that he has stopped smoking, drinking, and using illegal drugs,

and the administrative record shows his answers to the ALJ's questioning to be clear and concise without any apparent difficulty in recall. [Tr. 36]. The following exchange then took place regarding plaintiff's arrest record:

ALJ: Have you ever been arrested?

Plaintiff: Yes, ma'am. DUI.

ALJ: Anything else?

Plaintiff: No, ma'am.

ALJ: I show reckless driving, public intoxication, theft of property, disorderly conduct, assault, manufacture or seller of controlled substance, possession of drug paraphernalia, harassment, driving on a revoked or suspended license, failure to appear on a warrant, evading arrest, speeding, DUI, driver's license violations, leaving the scene of an accident, and violation of probation.

Plaintiff: Yeah.

ALJ: All those are correct?

Plaintiff: Yes, ma'am.

ALJ: I counted at least 19 arrests between 1978 and 2007. . . .

[Tr. 37].

Plaintiff lives with his mother and stepfather. [Tr. 366]. He explains that he lives with them because he cannot financially afford to live independently, rather than because of an inability to care for himself. [Tr. 366, 451]. Some of the paperwork supporting plaintiff's claim has been completed in whole or in part by his stepfather. [Tr.

145, 148]. Plaintiff has also listed his stepfather in response to the Commissioner's question, "Give the name of a friend or relative that we can contact (other than your doctors) *who knows about your illnesses, injuries, or conditions* and can help with your claim." [Tr. 152, 165] (emphasis added).

At some point prior to October 18, 2007, the stepfather contacted the Office of the Inspector General's Cooperative Disability Investigations Unit ("CDI"). [Tr. 374]. The CDI Report of Investigation states that the stepfather "advised that the subject [plaintiff] is able to return to work. The stepfather advised that the subject constantly drinks and parties." [Tr. 374].

Suspecting "malingering in order to become entitled to disability benefits," a special agent of the Tennessee Bureau of Investigations ("TBI") went to plaintiff's residence on October 18, 2007. [Tr. 374, 376]. The agent initially approached plaintiff under the ruse that his (plaintiff's) identity might have been stolen, but later explained the true purpose of the visit. [Tr. 376]. The agent described plaintiff as articulating clearly and concisely. [Tr. 376]. Plaintiff could walk at an average pace, and he stood throughout the interview. [Tr. 376]. No problems were observed with memory or physical functioning. [Tr. 376]. Plaintiff did appear "a little slow mentally" and exhibited confusion about the identity theft ruse. [Tr. 376]. Investigators also spoke with three unnamed witnesses who offered information both favorable and unfavorable to plaintiff's claims. [Tr. 376-78].

## III.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision.  42 U.S.C. § 405(g)*; Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)).  In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review.  *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability.  42 U.S.C. § 423(a)(1).  "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).[1]  Disability is evaluated pursuant to a five-step analysis summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520).  Plaintiffs bear the burden of proof at the first four steps.  *Walters*, 127 F.3d at 529.  The burden shifts to the Commissioner at step five.  *See id.*

---

[1] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability.  42 U.S.C. § 1382.  "Disability," for SSI purposes, is defined the same as under § 423.  42 U.S.C. § 1382c(a)(3).

IV.

*Analysis*

Plaintiff raises numerous issues in support of reversal or remand. The court will address those points in turn. Any arguments not raised in plaintiff's briefing are deemed waived. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006).

A. <u>Plaintiff's Mother</u>

The court will first address a rather remarkable criticism. Plaintiff contends that the ALJ's decision erroneously discounted his credibility based on a finding "*that he testified* that he took care of his mother . . . . But in reviewing the transcript, there actually is no reference in the hearing transcript that he takes care of his mother." [Doc. 12, p. 25] (emphasis added).

The ALJ's decision thrice finds that plaintiff cares for his ill mother. [Tr. 19] ("he is able to . . . care for his ill mother"); [Tr. 21] ("he . . . takes care of himself and his mother"); [Tr. 23] ("He cares for his mother who has Alzheimer's disease which can be quite demanding both physically and emotionally."). In none of these instances, however, did the ALJ cite plaintiff's testimony as the basis for that finding. The finding is instead made in the context of the ALJ's discussion of the administrative record.

Dr. Wike reported that plaintiff "takes care of his mother due to her disability during the day. . . . He spends his day time[] hours caring for his mother." [Tr. 366, 368]. Similarly, plaintiff told the speech and language evaluator that he "is helping to care for his

mother who is suffering from Alzheimer's dementia."  [Tr. 451].

There was therefore absolutely no error in the ALJ's finding or in her citation to the source of that finding.  Plaintiff's frivolous criticism merits no further discussion.

## B. High School Education / Ability to Communicate

Of similar merit is plaintiff's accusation, "The ALJ erred in finding that the Plaintiff has at least a high school education and is able to communicate in English." [Doc. 12, p. 24].  The challenged finding appears at page 9 of the ALJ's decision. [Tr. 24]. Plaintiff's argumentation on this point is, in its entirety, as follows:

> The Consulting Examiner Martha Wike determined that the Plaintiff operates in the extremely low range, consistent with mental retardation.  Plaintiff was unable to take all portions of the testing as he was unable to complete paper and pencil tasks.
>
> There are no medical records contradicting this finding.

[Doc. 12, p. 24].

The court finds plaintiff's argument to be so severely underdeveloped that it is waived.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed [argumentation], are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *United States v. Cole*, 359 F.3d 420, 428 n.13 (6th Cir. 2004) (citation omitted).

In any event, the court notes the following:

1. Plaintiff testified that he completed the twelfth grade. [Tr. 29].

2. He has elsewhere affirmed that fact in paperwork submitted to the Commissioner. [Tr. 135].

3. Plaintiff has similarly affirmed his ability to speak, read, and understand English [Tr. 130-31], which his administrative hearing testimony further confirms.

4. Consultative Dr. Summers deemed plaintiff's cognitive functioning and intelligence "appropriate for his degree of formal education." [Tr. 362].

5. The TBI special agent described plaintiff as articulating clearly and concisely. [Tr. 376].

6. The speech and language evaluation revealed articulation within normal limits. [Tr. 452].

7. Treating physician Mistry is able to "communicate with him very well." [Tr. 424].

In sum, even if plaintiff had not waived the issue, the ALJ did not err in finding that he has a high school education and is able to communicate in English.

## C. Mental Health Records

Plaintiff argues that the ALJ "committed reversible error in failing to even reference or discuss one of the records from [CHS]." [Doc. 12, p. 23]. He further argues that the ALJ "committed plain error in not understanding the meaning of the [GAF] scale employed by health care professions [sic]." [Doc. 12, p. 23].

Plaintiff's counsel first cites his own (counsel's) statement at the administrative hearing as evidence that "several" GAF scores of 50 had been assigned. However, there

were only two. [Tr. 533, 547]. Plaintiff appears to argue that the latter score is particularly probative because it was rendered in September 2008, "two and one-half years after the Plaintiff's initial stroke." [Doc. 12, p. 23]. However, plaintiff's initial stroke occurred in March of 2007, meaning that the September 2008 GAF notation was only <u>one</u> and one half years post-stroke.

Regardless, the two GAF notations of record have no substance in this case. The notations were made on a "Treatment Plan Review" form by an unknown source subsequent to only two brief and remote counseling sessions. The notations are not documented as being made by a medical professional (as opposed to, for example, an intake interviewer) contemporaneously in the context of a long-term treatment relationship. Even if the court were to presume that the ALJ erred in not discussing the two GAF scores, the error would be harmless. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (Harmless error may be found where a cited opinion is so lacking that no reasonable fact-finder could have credited it.).

Further, a GAF score is merely a "subjective determination." *See White v. Comm'r of Soc.* Sec., 572 F.3d 272, 276 (6th Cir. 2009) (citation and quotation omitted). A GAF score is generally "not particularly helpful by itself" and is "not dispositive of anything in and of itself." *Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011).

Lastly, the court turns to plaintiff's accusations that the ALJ "committed plain error in not understanding the meaning of" GAF scores or "not really know[ing] how to interpret the GAF scale." [Doc. 12, p. 23-24]. These statements are wholly without foundation.

In support of his argument, plaintiff has submitted a copy of the GAF scale purportedly supporting the proposition that "a score of 41-50 signifies that a physician believes that a patient is unable to maintain employment." [Tr. 202, 204; Doc. 12, p. 24]. In relevant part, the GAF scale states,

> 50 - 41 **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).

[Tr. 204] (emphases in original). Quite obviously, the inability to maintain a job is but one possible circumstance in a nonexhaustive list referenced in the GAF scale. A score of 50 does not *per se* mean that anyone "believes that a patient is unable to maintain employment." The score could just as easily refer to shoplifting, social functioning, or countless other issues. There was no error.

## D. CDI

The ALJ assigned "significant weight" to the CDI report prepared by "specially trained professionals [who] thoroughly researched the issue." [Tr. 23]. Plaintiff contends that this too was error. He characterizes the investigators as "non-medical personnel" who "initially lied to" him and who unduly relied on interviews with unnamed witnesses lacking

in medical or vocational expertise.

The court finds no error whatsoever. Initially, it is worth noting that the CDI investigation was kindled by the rather extraordinary spark of plaintiff's own stepfather reporting that he was malingering, drinking, and "partying." As for the investigators' qualifications, the court sees no reason to disagree with the ALJ that those persons are in fact specially trained and competent, irrespective of whether or not they are medical professionals. The observations made by the TBI special agent (such as that plaintiff articulated clearly, walked at an average pace, stood throughout the interview, and displayed no obvious problems with memory or physical functioning) do not require a medical degree.

As for the special agent "lying to" plaintiff, it is perfectly understandable that the in-person contact was initiated in a manner that would catch the subject "off guard." As for the interviewing of unnamed witnesses (presumably plaintiff's friends, neighbors, family, or former coworkers), the court sees nothing sinister or incompetent in that investigative technique. Quite simply, plaintiff has given the court no reason to question the ALJ's reliance on the CDI investigation.

E. Credibility

The ALJ found plaintiff's subjective reporting to be less than reliable, stating,

The extreme description of the symptoms and limitations which the claimant has provided throughout the record has generally been inconsistent and unpersuasive. Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies combined with the claimant's criminal arrest record suggest that the information provided by the claimant generally may not be entirely reliable. The record includes evidence strongly suggesting that the claimant has exaggerated symptoms and limitations.

[Tr. 23]. Plaintiff argues that this finding "clearly" stems at least in part from the discrepancies in his testimony pertaining to his significant arrest record. As cited above, plaintiff initially testified that he had only been arrested once, for DUI. Then, after the ALJ recited a laundry list of prior offenses, plaintiff acknowledged that his criminal background was more extensive than merely a single DUI.

Presuming that the ALJ in fact relied on this inconsistent testimony, plaintiff argues that the reliance was error.

But plaintiff would point out that memory impairment is a normal symptom of stroke victims. The record contains numerous references from physicians and psychologists that the plaintiff suffers memory issues . . . .

[Doc. 12, p. 24]. In support of such an argument, one would expect plaintiff to cite where those "numerous references from physicians and psychologists" would be found in the nearly 600 pages of administrative record. But that is not the case. Instead, plaintiff cites four lines *from his own administrative brief*. [Doc. 12, p. 24].

Arguably, this shortcoming alone renders plaintiff's entire argument waived. *See Cole*, 359 F.3d at 428 n.13. "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *Id.* The court has nonetheless "put flesh on the bones of" this issue by combing the actual medical records for the sources of plaintiff's self-citations.

Plaintiff's first citation [Tr. 191, line 8] is to a sentence from the consultative report of Dr. Summers actually found at page 361 of the administrative record. The language cited and quoted by plaintiff is as follows: "He continues to have problems . . . with poor memory recall." [Tr. 191]. However, this citation is not to a medical source finding as represented by plaintiff. Instead, the citation is to the paragraph of Dr. Summer's report in which that physician summarizes plaintiff's subjective complaints. [Tr. 361]. It is not a finding at all. In fact, Dr. Summers made no findings whatsoever pertaining to plaintiff's memory [Tr. 362-63] *and* he concluded his report by recommending that plaintiff should be reevaluated "for improvement" in the future since his examination had taken place a mere four months post-stroke. [Tr. 363].

Plaintiff's second citation to his own brief [Tr. 192, lines 30 & 43] again turns out to be to an examiner's summary of plaintiff's subjective complaints. Specifically, plaintiff (indirectly) directs the court's attention to the fact that *he told* Dr. Wike that he cannot remember high school or most of his prior jobs. [Tr. 366]. Again, a medical source's recording of plaintiff's subjective complaints is not a medical finding.

Through his third self-citation [Tr. 193, lines 30-31], plaintiff finally leads the court to a medical opinion. Dr. Wike wrote that plaintiff's memory has "apparently significantly declined in his case." [Tr. 367]. It is noted, however, that Dr. Wike's evaluation took place only six months post-stroke and that: (1) within the following month, plaintiff's stepfather reported that he was malingering; (2) the TBI special agent's investigation provided support for that conclusion; and (3) by July 2008, plaintiff's speech and language evaluation had been interpreted as indicating that his memory complaints are not credible.

Plaintiff does also directly cite the court to one page of the record purportedly supporting his position. He states, "Of further note is that the psychiatrist who examined the Plaintiff on September 26, 2008, one and one-half years after Dr. Wike's examination, again indicated that it might be necessary to rule out a cognitive disorder. (Tr. p. 547)[.]" [Doc. 12, p. 25]. Plaintiff refers to the latter of two "Treatment Plan Review" forms previously discussed by the court. Once again, plaintiff has overstated the import of his cited evidence.

There is no indication that the September 26, 2008 form was completed following any examination or appointment that date. The form instead appears to be merely a periodic file review regarding a patient who had not been seen in more than nine months. Further, September 26, 2008, was not "one and one-half years after Dr. Wike's examination" - it was one year and nine days after her exam. Regardless, the "Treatment Plan Review" forms have already been discussed by the court, and their minimal relevance has already been

explained.

Returning to the opinion of Dr. Wike, the court recognizes that she did find plaintiff to be credible, and her conclusions are supported by subjective testing. However, as discussed herein, the administrative record presents conflicting evidence as to the extent of plaintiff's purported memory loss - particularly as to the extent of that condition on the day of his administrative hearing (approximately 26 months after his stroke). In her decision, the ALJ recognized that it is impossible on the facts of the present case to know whether or not plaintiff is telling the truth. [Tr. 23]. She then made a decision and cited the evidence that lead her to that conclusion. The substantial evidence standard of review permits that "zone of choice," *see Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

> [A]fter listening to what [plaintiff] said on the witness stand, observing his demeanor, and evaluating that testimony in light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [plaintiff] was trying to make his symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment. It is a difficult job, and the people who perform it sometimes err. Such errors are obviously difficult for a reviewing court to detect (the reviewing court not having seen the claimant in the flesh), and we will not normally substitute our impressions on the veracity of a witness for those of the trier of fact. ***We would be particularly reluctant to do so in this case, where there seem to be demonstrable discrepancies between what the claimant said on the stand and what the written record shows***.

*Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) (emphasis added).

In sum, the evidence cited by plaintiff does not unquestionably explain how he could have forgotten all but one episode of his extraordinary criminal history only to recall

it moments later. Plaintiff would like for the record and his credibility to have been interpreted differently by the ALJ, but that approach misconstrues the substantial evidence standard. Presuming that the ALJ relied on plaintiff's inconsistent testimony pertaining to his arrest record, she did not err in doing so. Her conclusion was sufficiently explained and supported.

## F. RFC

Lastly, and ultimately, plaintiff accuses the ALJ of making a series of "bizarre findings" in relation to his RFC, "fl[ying] in the face of the vast weight of the medical evidence in the file." Specifically, plaintiff argues that the RFC findings should have been more restrictive as to his abilities to walk, stand, use his right hand, and perform simple tasks.[2]

As for the ability to carry out simple tasks, the ALJ's conclusion was consistent with the opinions of the nonexamining psychologist and psychiatrist, and the opinion of speech pathologist Ms. Allen. Further, the credibility of plaintiff's alleged mental limitations has been discussed above and warrants no further attention.

As for plaintiff's physical arguments, as cited by the ALJ [Tr. 20-21] the record indicates that he has gradually improved since his stroke. Plaintiff has admitted that he is

---

[2] Illustrative of the level of development devoted to these arguments is the contention that the ALJ disregarded "the voluminous records from the multitude of treating physicians." [Doc. 12, p. 27]. Plaintiff does not, however, then cite the court to even one page of the purportedly "voluminous records" of the purported "multitude of treating physicians." His issues are, again, arguably waived by his failure to develop them. *See Cole*, 359 F.3d at 428 n.13.

able to perform all activities of daily living without assistance. He lives with his mother and stepfather for financial - not health-related - reasons. As cited by the ALJ, plaintiff spends his days caring for his severely ill mother. That activity is wholly inconsistent with his purported limitations in walking, standing, and grasping. To the extent that disabling pain is alleged, the ALJ correctly noted plaintiff's testimony that medication reduces that pain to a level of 2 out of 10.

The record does document a vascular condition in plaintiff's legs. However, plaintiff's most recent "biggest complaint" stemming from that condition is leg fatigue after walking "great distances." [Tr. 525]. Obviously, plaintiff would not be aware of that complaint unless he was actually able to walk "great distances" - a fact inconsistent with the standing and walking limitations he alleges. Moreover, even if the ALJ had restricted plaintiff to light or sedentary work, the VE identified a significant number of existing jobs in those reduced categories. [Tr. 49].

In the end, the ALJ concluded that plaintiff's alleged limitations are overstated. She explained the basis for that conclusion. For the reasons cited herein that conclusion survives substantial evidence review. The final decision of the Commissioner must therefore be affirmed. An order consistent with this opinion will be entered.

ENTER:

_____s/ Leon Jordan_____
United States District Judge